IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 5, 2022

**WILLIE NOLAN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 12-03247          John Wheeler Campbell, Judge**

_____

**No. W2021-00587-CCA-R3-PC**
_____

The Petitioner, Willie Nolan, appeals the Shelby County Criminal Court's denial of his petition seeking post-conviction relief from his convictions of attempted reckless endangerment, aggravated assault, reckless aggravated assault, felony reckless endangerment, and vandalism by a Shelby County jury, claiming he received ineffective assistance of counsel at trial. State v. Willie Nolan, No. W2014-00990-CCA-R3-CD, 2015 WL 5838739, at *1 (Tenn. Crim. App. Oct. 7, 2015), perm. app. denied (Tenn. Feb. 18, 2016). Upon review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and TIMOTHY L. EASTER, JJ., joined.

Stephen K. Barnes, Memphis, Tennessee, for the Petitioner, Willie Nolan.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The facts giving rise to the Petitioner's convictions stem from an August 28, 2011 altercation with Shiquanna Whitfield, Lasondra Scott, and Sean Deadmon, all of whom were previously acquainted. During a car ride, the Petitioner verbally threatened Scott and Whitfield, and was subsequently let out of the car. After letting the Petitioner out of the car, Whitfield and Scott drove to Deadmon's house and stood on the porch talking. During that time, they saw the Petitioner drive by in another car, and Whitfield picked up a stick

because the Petitioner had previously called and threatened them.  Seven to ten minutes later, the Petitioner came around the side of Deadmon's house carrying a solid pipe, screaming as he approached that he was going to kill Scott and Whitfield.  Our direct appeal opinion provided the remaining facts as follows:

> As the [Petitioner] ran toward Ms. Scott while swinging the pipe, Ms. Scott first swung a bat at the [Petitioner] but missed.  Ms. Scott testified that she had armed herself with the bat because of the [Petitioner's] repeated threats.  The [Petitioner] proceeded to hit Ms. Scott numerous times on her shoulder and arms.  During this ordeal, Ms. Scott attempted to escape but slipped and fell.  The [Petitioner] jumped on top of Ms. Scott and began attempting to strike her head with the pipe, but she was able to protect her head with her arms, which resulted in further injuries to both her right and left arms. Ms. Scott testified that the [Petitioner]was wearing a black glove over the hand holding the pipe, which was apparently hot as it caused burns to Ms. Scott's arms where she was struck with it. Ms. Scott testified that during this time, she feared for her life.
>
> While the [Petitioner]was attacking Ms. Scott, Ms. Whitfield and Mr. Deadmon were attempting to break up the altercation.  Ms. Whitfield was still armed with a stick, although she testified that the [Petitioner] was mainly focused on Ms. Scott.  During her attempt to stop the attack, Ms. Whitfield was hit on the arm with the pipe.  Mr. Deadmon was struck multiple times by the [Petitioner] while trying to prevent the [Petitioner] from attacking Ms. Scott.
>
> After Ms. Scott finally escaped from the [Petitioner], she ran inside Mr. Deadmon's house where Mr. Deadmon's mother, sister, and Ms. Whitfield were hiding.  Once she was inside Mr. Deadmon's house, the [Petitioner] picked up the bat that Ms. Scott previously held and began smashing the windows and tail lights of Ms. Whitfield's car.  According to Ms. Whitfield, the [Petitioner] said, "B——h, since I can't get you, I'll get your car."  Ms. Whitfield testified that the attack lasted approximately ten to fifteen minutes.

Willie Nolan, 2015 WL 5838739, at *1-3.  Following the close of proof, the trial court granted the Petitioner's motion for judgments of acquittal in counts two and four after finding that the State had failed to prove the element of serious bodily injury relative to the assaults of Scott and Deadmon.  A jury subsequently convicted the Petitioner of the lesser included offense of attempted misdemeanor reckless endangerment and aggravated assault of Scott, respectively.  The Petitioner was also convicted of the lesser included offenses of

reckless aggravated assault of Deadmon, felony reckless endangerment of Whitfield, and vandalism of $500 or less. Following a sentencing hearing, the trial court merged the attempted reckless endangerment conviction of Scott into the aggravated assault conviction and imposed a total effective sentence of twenty-seven years. Id.

The Petitioner appealed his convictions to this court and argued that (1) the trial court erred by allowing the prosecution to enter as substantive evidence the unsigned statement of a witness (Deadmon) in violation of Tennessee Rule of Evidence 803(26); and (2) there was insufficient evidence to support the convictions for aggravated assault, reckless aggravated assault, and felony reckless endangerment. Id. In affirming the convictions, this court determined that the trial court did not err in finding that the witness's (Deadmond's) written statement was "signed by the witness" as required by Rule 803(26)(b), id. at *5, and that the trial court's admission of the statement as substantive evidence without first conducting a hearing was harmless error. We further concluded that (1) the jury was instructed on self-defense and chose not to credit the Petitioner with that defense; thus, there was sufficient evidence for a reasonable jury to convict the Petitioner of the aggravated assault against Scott, id. at *8; (2) there was ample evidence that the Petitioner knew that swinging the pipe could hurt anyone who was hit by the pipe; thus, a reasonable jury could infer that the Petitioner was acting recklessly resulting in injury with regard to the assault against Deadmon, id.; and (3) that the pipe, as utilized by the Petitioner, was a deadly weapon that the Petitioner knew could hurt anyone who was hit by the pipe, and a reasonable jury could infer that the Petitioner's conduct was reckless in support of the assault against Whitfield and reject the Petitioner's theory of self-defense. Id. at *9.

The Petitioner filed a timely *pro se* petition for post-conviction relief, which was amended multiple times after the appointment of counsel. The Petitioner claimed, in relevant part, that he received ineffective assistance of counsel because his trial counsel gave him improper advice during plea negotiations, failed to conduct pre-trial investigations, failed to impeach witnesses with prior inconsistent statements during trial, and that trial counsel had an actual conflict of interest.

At the post-conviction hearing, Deadmon, the victim who attempted to break up the altercation between the Petitioner, and Scott and Whitfield, the other two victims, testified on behalf of the Petitioner. Deadmon testified generally about his relationship with the Petitioner, a long-time neighbor, and his observations on the day of the offense. Asked who had the stick first, Deadmon replied, "I saw her with the stick. Now, where [the Petitioner's] stick come from out the blue, I don't know….as a matter of fact I do. When she hit him, her stick came out of her hand. He picked it up and hit her back." He confirmed however that he did not know who "took the first swing." Asked if Deadmon was aware of anything else that might impact the credibility of the other two victims,

Deadmon replied, "They were very crooked." On cross-examination, Deadmon agreed he could not recall the details of what occurred the day of the offense because it happened over nine years ago. He agreed that his memory of the event was better at the time he gave his statement to police, which was a day or so after the altercation. When asked specifics about his police statement, he could not remember whether the Petitioner was chasing the victim with a pipe in his hands. Even after being permitted to refresh his recollection with his statement, Deadmon testified he may have said those things, but he simply could not remember. He testified that he only knew "they got into it in my yard," he "broke it up and got hurt," and as to "who hit who first, I couldn't tell you [.]" While he continued to see the Petitioner's family in the neighborhood, he had not seen "those women" since the altercation.

Deadmon's statement to the police shortly after the offense was exhibited to the hearing and provided, in relevant part:

Q: Who were you involved with [during the altercation in his yard]?
A: Actually, I was sitting there on the porch with my neighbor and my mom when Lasondra [Scott] I don't know her last name came running up yelling at me to please help her. She [was being] chased by [the Petitioner], he had a pipe in his hand. I asked her what was going on and she told me that he was trying to hurt her and he tried to swing on her. [The Petitioner] told her "I'm fixing to kill you bitch" and he swung at her on her arm real hard. She threw her hands up and tried to protect herself and she got behind me. I told [the Petitioner], to stop and stepped between both of them. Once I did that he kept swinging and that's when he hit me. [The Petitioner], ran around me and chased Lasondra [Scott] around the yard and she fell and [the Petitioner], started hitting her again on the head, face, and her stomach. I tried to lean across her to stop some of the blows, that's when I got hit. My neighbor, Shiquana [Whitfield] drove up into the yard and [the Petitioner], hit her one good whap on the arm with that pipe.
….
Q: Do you know where the Petitioner got the weapon from?
A: No sir, he had it when he chased Lasondra [Scott] into my yard. He came with the intent to hurt that girl.
….
Q: Is there anything else that you would like to add to your statement that would assist in this investigation?
A: Yes, I want to prosecute him, he tried to kill Lasondra [Scott].

Rosetta Nolan, the Petitioner's mother, testified that she was present on the day of the offense and observed the events leading up to "the commotion" in Deadmon's yard.

- 4 -

According to Ms. Nolan, the Petitioner had repaired a car for "the girls," and they were unwilling to pay him. She said she saw both girls with baseball bats, the Petitioner managed to wrangle a bat away, but Ms. Nolan intervened and told the Petitioner not to hit the girl with the bat. The Petitioner complied, vandalized a car instead, and they returned to Ms. Nolan's home down the street. She insisted her son never struck either victim. Ms. Nolan said she met trial counsel on the day of trial; however, he did not interview her. She was interviewed by the State, but she did not testify at trial. On cross-examination, she agreed she did not return to Deadmon's yard when police arrived to explain what she had observed. In light of her testimony that no one was struck, she could not provide an explanation for the injuries suffered by the victims.

Trial counsel, a veteran criminal defense lawyer with over fourteen years' experience at the time of the Petitioner's trial, testified that he had been retained to represent the Petitioner. Trial counsel met with the Petitioner several times prior to trial, after the verdict in preparation for the appeal, and trial counsel never once declined any of the Petitioner's calls. Trial counsel said that he spoke with the Petitioner frequently through three-way phone calls facilitated by the Petitioner's mother and that he spoke with the Petitioner's mother "all the time." Asked about his initial trial preparations, trial counsel explained that the Petitioner provided him with an affidavit purportedly from individuals who would attest that the Petitioner was in Ohio at the time of the offense. When trial counsel pressed the Petitioner for the names and addresses of these individuals, the Petitioner declined to provide them and told trial counsel they could not appear in court to testify. Trial counsel questioned the authenticity of the affidavit based on the Petitioner's refusal to provide any details. Trial counsel also explained that a similar affidavit appeared in another case, and he opined that the origin of the affidavit was from the jail. Trial counsel did not hire an investigator because he was not going to investigate "a negative." Given these circumstances, trial counsel concluded he could not proceed with an alibi theory of defense and chose instead to focus his trial strategy on making the State prove the Petitioner was the first aggressor beyond a reasonable doubt.

In this effort, trial counsel reviewed the discovery, the witness statements, and spoke to the witnesses prior to trial. He filed a motion to suppress the identification of the Petitioner, which enabled him to cross-examine the witnesses involved prior to trial. At trial, he recalled that one of the victims testified that she "cast the first blow," which was not included in any of the statements provided in discovery. Asked why the witness was not impeached with this information, trial counsel said, "it gave me an avenue to boost my defense in regard to who the first aggressor was." Trial counsel capitalized on this testimony by asking the case detective if he had had this information in his file would it have changed the way the case was investigated, and the detective said yes. Trial counsel successfully moved to dismiss the counts alleging serious bodily injury (counts two and four), which bolstered his position that hiring a medical expert was unnecessary to interpret

the medical records. Aside from the two counts of aggravated assault that were dismissed based on trial counsel's successful motion for directed verdict, the record further reflects that the Petitioner was originally charged with attempted second-degree murder (count one); aggravated assault (count three); aggravated assault (count five); aggravated assault (count six); and vandalism over $500 (count seven). The Petitioner was convicted of the lesser included offenses of attempted reckless endangerment (count one), reckless aggravated assault (count five), felony reckless endangerment (count six) and vandalism under $500 (count seven). Trial counsel believed that the reduced offenses of conviction were based, in large part, on his attacks on the victims' credibility.

Trial counsel also recalled that he communicated the State's offer for the Petitioner to plead guilty in exchange for eight years imprisonment to be served at thirty-five percent. Asked how he communicated the offer of settlement, trial counsel described his normal practice of explaining the charges, conviction offenses, and the possible maximum and minimum penalty based on a defendant's sentencing range. He could not recall what he told the Petitioner his range was but stated that he was sure he relied on the Petitioner's record and gave him an accurate assessment. He further testified that he advised the Petitioner that he thought the State's offer was "fair and something he should consider in taking" but that this made the Petitioner "mad" because it seemed like trial counsel was not "fighting for him." Trial counsel said the Petitioner was "defiant about accepting any offer." Asked on cross-examination if he recalled ever indicating to the Petitioner that the State's offer was not a good offer or that the Petitioner should reject it, trial counsel replied, "Based on the defense that he wanted me to pursue I could never imagine saying such a stupid thing." Asked if he recalled indicating to the Petitioner that an eight-year sentence was the most he could receive if convicted, trial counsel replied, "Absolutely not."

The Petitioner also testified at the post-conviction hearing and agreed that trial counsel met with him at the jail "a few times" but denied they met as often as trial counsel claimed. The Petitioner believed the defense theory prior to trial was that he "wasn't there," and was under the impression the affidavit would be admitted at trial. Asked if he discussed the names of the witnesses who could attest to his whereabouts with trial counsel, the Petitioner said they never discussed it because he had given that information to the previous attorney assigned to represent him. The Petitioner denied trial counsel discussed the admissibility or impact of the affidavit. Asked if he wanted anyone to testify at trial that was not called, the Petitioner stated that he wanted his mother and Kim Deadmon, Sean Deadmon's sister, to testify because they witnessed the altercation. The Petitioner also stated that he asked trial counsel to go to the neighborhood and talk to potential witnesses but that trial counsel "never attempted to do that." On cross-examination, the State questioned the Petitioner about his understanding of the defense theory that was going to be presented at trial. He testified that he did not know what defense theory trial counsel was going to pursue. When pressed by the State about what theory the Petitioner initially

wanted trial counsel to pursue, the Petitioner stated, "I don't even — I don't even know to tell you the truth, ma'am. I don't even understand." The Petitioner also testified that trial counsel relayed the State's offer, but trial counsel did not believe it was a good offer because trial counsel "never investigated [his] prior files and didn't know [he] had no priors." He also testified that they "never discussed anything about sentencing." Had the Petitioner known he could have been sentenced to twenty-seven years imprisonment; he would have accepted the State's eight-year offer. The Petitioner complained further that trial counsel should have (1) consulted with him more prior to trial regarding self-defense; (2) impeached trial witnesses in the same fashion as the State; and (3) hired a medical expert to rebut the testimony of the victims regarding their injuries.

After the hearing, the post-conviction court denied the Petitioner's petition for post-conviction relief, finding that the Petitioner failed to show by clear and convincing evidence that his trial counsel was ineffective. The Petitioner timely filed a notice of appeal, and this case is now properly before this court for review.

## ANALYSIS

The Petitioner contends he is entitled to post-conviction relief because trial counsel was ineffective in providing inaccurate advice during plea negotiations, in failing to adequately prepare for trial, in failing to impeach witnesses at trial, and in failing to withdraw after discovering a conflict of interest. The State responds, and we agree, that the Petitioner's claims are without merit and that he is not entitled to relief.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Id. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents a mixed question of law and fact. Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). This court reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." Whitehead v. State, 402 S.W.3d 615, 621 (Tenn. 2013) (citing Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Calvert, 342 S.W.3d at 485). However, a post-

conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, appellate courts are not free to re-weigh or re-evaluate the evidence, nor are they free to substitute their own inferences for those drawn by the post-conviction court." Whitehead, 402 S.W.3d at 621 (citing State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001)). "As a general matter, appellate courts must defer to a post-conviction court's finding with regard to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Id. (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)).

The right to effective assistance of counsel is protected by both the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad, 938 S.W.2d at 370.

In assessing an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. 689-90. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-89. However, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

**A. Plea Negotiations.** The Petitioner asserts trial counsel was ineffective because he advised the Petitioner against pleading guilty after miscalculating his sentencing range, resulting in the Petitioner declining the State's offer and receiving a higher sentence after his conviction. Trial counsel testified, and the Petitioner agreed, that the State offered the Petitioner a sentence of eight years to be served at thirty-five percent in exchange for pleading guilty. Trial counsel's routine practice was to explain the charges, potential conviction offenses, and the possible maximum and minimum penalty based on a defendant's sentencing range. While he could not recall what he specifically told the Petitioner regarding his range, trial counsel was certain he relied on the Petitioner's record and gave him an accurate assessment. Trial counsel told the Petitioner that he thought the State's offer was "fair and something he should consider in taking" but the Petitioner misinterpreted it and became "defiant about accepting any offer." Trial counsel emphatically denied telling the Petitioner that an eight-year sentence was the most he could receive if convicted. By contrast, the Petitioner claimed that trial counsel inaccurately told him that the eight-year offer "constituted the maximum sentence [he] was likely to receive if convicted" and "advised [him] not to accept the offer." The Petitioner was sentenced to twenty-seven years following his conviction, and now claims, had he been given the proper advice concerning his sentencing range, he would have accepted the State's eight-year offer. In its order denying relief, the post-conviction court accredited the testimony of trial counsel over the testimony of the Petitioner. See Whitehead, 402 S.W.3d at 621 (appellate courts must generally defer to findings of post-conviction court with regard to witness credibility). Based on trial counsel's accredited testimony, the Petitioner has failed to establish deficient performance, and he is not entitled to relief.

**B. Trial Preparation.** Next, the Petitioner claims trial counsel was ineffective in failing to adequately prepare for trial, in failing to interview or subpoena witnesses, and in failing to hire investigators or medical experts. The Petitioner initially contends trial counsel was ineffective in failing to interview or subpoena the Petitioner's mother and Kim Deadmon, Sean Deadmon's sister. The Petitioner failed to present Kim Deadmon as a witness at the post-conviction evidentiary hearing; thus, he cannot meet his burden of establishing deficiency of trial counsel or prejudice to his case. Black v. State, 794 S.W.2d 752, 758 (Tenn. Crim. App. 1990). The record shows that trial counsel spoke with the Petitioner's mother frequently, prior to trial. Trial counsel was not asked his reasons for not calling the Petitioner's mother at trial. The Petitioner's mother denied speaking with trial counsel until the day of trial and testified at the post-conviction hearing, under the most liberal reading of her account of the event, that the victims were the initial aggressors during the altercation. However, Scott admitted as much in her testimony at trial, Willie Nolan, 2015 WL 5838739, at *2; thus, it cannot be said that, had trial counsel interviewed the Petitioner's mother prior to the trial and called her as a defense witness, the result of the trial would have been different. Accordingly, the Petitioner is not entitled to relief on this issue.

- 9 -

The Petitioner also claims trial counsel was deficient in failing to hire an investigator. He speculates that an investigator may have been able to establish the Petitioner's whereabouts on the day of the assaults or discover impeachment information to use against the State's witnesses. Trial counsel did not hire an investigator to investigate the affidavit provided by the Petitioner because of its dubious nature and because trial counsel refused to investigate a "negative." Trial counsel did not need to hire a medical expert because he knew, based on his investigation and understanding of the law, that the State could not establish the element of serious bodily injury in two counts. Based on his expertise, trial counsel successfully moved to have those counts dismissed and obtained verdicts on lesser included offenses. In denying relief, the post-conviction court noted trial counsel was prepared for trial, had reviewed all the discovery, and crafted a reasonable trial strategy. The post-conviction court also acknowledged the conflicting nature of the Petitioner's testimony concerning his purported alibi defense and his simultaneous request for trial counsel to interview witnesses in the neighborhood who he claimed would attest the victims were the initial aggressors. We agree with the determination of the post-conviction court and conclude that the Petitioner has failed to demonstrate by clear and convincing evidence that trial counsel was deficient or prejudice to his case. He is not entitled to relief.

C. **Failure to Impeach.** The Petitioner also claims trial counsel was ineffective in failing to impeach Scott, who disclosed for the first time at trial that she was the first aggressor. The Petitioner believes trial counsel was deficient in failing to impeach Scott by omission because she had not disclosed this information in her prior statements to police. Trial counsel chose not to impeach Scott with this information because she provided favorable testimony to their theory of defense; namely, that she was the primary aggressor. The State argues, and we agree, that this was a sound strategic decision and that "it is counterintuitive to impeach witnesses by omission when the additional testimony is helpful." Alley v. State, 958 S.W.2d 138, 149 (Tenn. Crim. App. 1997) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn.1982) ("this court may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation"). Accordingly, the Petitioner has failed to establish by clear and convincing evidence that trial counsel's performance was deficient, and he is not entitled to relief on this issue.

D. **Conflict of Interest.** Finally, the Petitioner claims trial counsel was ineffective in failing to withdraw based on trial counsel's belief that the affidavit supporting the purported alibi was false. The Petitioner claims this constituted an actual conflict of interest under which trial counsel was required to withdraw. Trial counsel was suspicious the affidavit may have been false; however, trial counsel advised the Petitioner that the affiants would be required to appear in court and testify. When trial counsel did not receive

the addresses of the purported alibi witnesses, he presumed they were not available to testify. Trial counsel then focused his trial strategy on requiring the State to prove the Petitioner was the first aggressor. Trial counsel was successful in his effort in so much as two of the Petitioner's charges were dismissed, and the Petitioner was convicted of lesser included offenses in four other charges. Regarding this issue, the post-conviction court determined that "there ha[d] been no testimony that this knowledge [that the same affidavit was given to counsel by another defendant in another case] prevented counsel from fully representing the [P]etitioner. This information did not require counsel to choose one client over another . . . . This proof only shows that counsel was on notice that the affidavit could be fake." The record does not preponderate against the determination of the post-conviction court. Accordingly, the Petitioner has failed to establish by clear and convincing evidence that trial counsel was deficient in representing him under an actual conflict of interest. The Petitioner is not entitled to relief.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. MCMULLEN, JUDGE